JAMES FRANKLIN
SMITH

07-48-02
(EGS)

**FILED**

MAY 30 2007

**Statement of the Offense**

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

The facts contained herein are not complete in all details. Instead, they are provided in order to demonstrate that the elements of the charged offense have been met for purposes of a guilty plea in this case. These are not all of the facts known to the defendant, James Franklin Smith, and to the Government.

---

Sometime in 2006, the defendant, James Franklin Smith, was approached by William Poynter, whom Smith knew to be a certified public accountant. (Smith and Poynter worked in the same building in Lanham, Maryland.) Poynter told Smith that a man had contacted him about laundering money that the man said was proceeds from selling illegal drugs. Poynter knew this man as "Jay" (unbeknownst to Poynter and Smith, Jay was in the employ of United States Immigration and Customs Enforcement ("ICE")).

Between April 19, 2006, and April 26, 2006, there were a series of telephone conversations between Poynter and Jay. During these telephone conversations, Poynter told Jay that his associate "Frank Smith" (referring to defendant Smith) would contact him to further the money laundering plan. Smith contacted Jay and Smith and Jay agreed to meet at Ceiba Restaurant located at 701 14th Street, N.W., Washington, D.C., on April 27, 2006, to discuss laundering what Smith thought was money from Jay's drug trafficking business.

On April 27, 2006, Smith met at the restaurant with Jay, Metropolitan Police Department Detective Phillip Robinson, who was posing as a drug trafficker and Jay's purported boss. Smith arrived and spoke openly with Jay and Detective Robinson about laundering the purported drug proceeds. During the meeting Smith also agreed to make cash deposits at local banks for Jay, and then to wire transfer the money to a foreign bank account, which would be provided by Jay. The men agreed to meet the next day at Poynter's office for the purpose of Jay supplying the money to be laundered. Smith requested approximately a ten percent fee for his services.

On April 28, 2006, Smith, Jay, Detective Robinson, and ICE Special Agent ("SA") Byron Braggs who was posing as a member of the drug enterprise, met in a parking lot next to Poynter's office. During the meeting Smith agreed to deposit $28,400 in purported drug proceeds for a fee of $1,600. Wiring instructions were given to Smith by Jay, as was $30,000 ($28,400 to be deposited and $1,600 for Smith's services).

The same day, Smith entered the Bank of America located at 9436 Lanham-Severn Road in Seabrook, Maryland. At approximately 12:25 p.m., Smith deposited $28,400 into an account in the name of the True Faith Deliverance Church (which is a defunct church). The bank account was previously set up by Smith. A bank employee prepared a Currency Transaction Report ("CTR") in Smith's name. On April 29, 2006, Smith returned to the same Bank of America branch and completed the wire transfer of $28,355 ($28,400 less a $45 bank wire fee) to, per Jay's instructions, a bank account in London, England (which, unbeknownst to Smith was an ICE bank account).

11

On June 27, 2006, Jay and SA Braggs met with Poynter and Smith inside Poynter's office. Jay said he had just returned from Mexico. The undercover ICE agent was holding a yellow bag with the words "Cozumel, Mexico" written on it; the bag contained $40,000. Smith said that laundering the money would be hard for him to do unless he was paid $3,000. Smith was given $40,000: $37,500 to be laundered, and $2,500 as a fee for laundering the purported drug proceeds.

Shortly thereafter on the same date, Smith, Jay, and SA Braggs traveled to the same Bank of America branch in Seabrook, Maryland. At approximately 2:20 p.m., Smith deposited $37,500 into the True Faith Deliverance Church bank account. A bank employee prepared a CTR in Smith's name. Shortly after the money transfer, all of the parties returned to Poynter's office. Smith went into his place of employment, Residential Lending, and made a copy of the deposit slip for Jay, while Poynter discussed the illegal money transfer. Jay handed an envelope containing $2,500 to Poynter, who then handed the envelope to Smith. On June 28, 2006, the wire transfer (less a $45 fee) was completed to the ICE bank account in London.

Shortly before August 8, 2006, Smith called Jay and set up a meeting at Poynter's office to launder more drug proceeds. On August 8, 2006, Jay and SA Braggs met with Poynter and Smith at Poynter's office. The purpose of the meeting was to launder $60,000. Jay told Poynter and Smith that he had a shipment of thirty-five kilograms of cocaine arriving into the United States and asked whether they could assist him by storing the drugs. Poynter said that he had known someone who could do so up until the previous week. Smith stated that he had a storage shed and could store the cocaine for Jay.

Jay dumped $56,500 in cash on Poynter's conference table. SA Braggs retrieved an envelope containing $3,500 and with the words "Mr. Poynter" and "$3,500" written on the outside of it. The envelope was handed to Poynter as the fee for laundering the money. Poynter discussed the commission with Smith, and then handed the envelope to Smith. Smith took a portion of the money out of the envelope and gave that money to Poynter.

The same day, Smith, Jay, and SA Braggs traveled to the BB&T Bank located at 9395 Lanham-Severn Road in Lanham, Maryland. At approximately 2:35 p.m., Smith deposited $56,500 into a bank account in the name of the True Faith Deliverance Church. A bank employee prepared a CTR in Smith's name. On August 9, 2006, the wire transfer was completed and the money was deposited in the ICE account in London. (A $40 bank wire fee was charged).

All told, the money laundering conspiracy involving Poynter, the defendant, and Cook laundered $135,000 in purported drug money on behalf of Jay and his associates, and, in exchange, Poynter, the defendant, and Cook were paid $8,000 in fees.

---

I agree that the above facts are true and correct. The above facts are not all that are known to James Franklin Smith, but simply those which are necessary to establish the offense to which he is pleading guilty.

_____
James Franklin Smith, Defendant

_____
Thomas Abbenante, Esq.
Counsel for Mr. Smith

_____
Anthony F. Scarpelli
Gregory G. Marshall
Assistant U.S. Attorneys